

DA 12-0771

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 312

H.E. SIMPSON LUMBER CO.,

> Counter-Claimant, Appellant
> and Cross-Appellee,

v.

THREE RIVERS BANK OF MONTANA,

> Counter-Defendant, Appellee
> and Cross-Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV 06-341B
Honorable Katherine R. Curtis, Presiding Judge

COUNSEL OF RECORD:

> For Appellant:

> > Quentin M. Rhoades, Alison Garab; Sullivan, Tabaracci & Rhoades, P.C.;
> > Missoula, Montana

> For Appellee:

> > Charles E. Hansberry, Isaac M. Kantor; Garlington, Lohn & Robinson,
> > PLLP; Missoula, Montana

Submitted on Briefs:  September 18, 2013
Decided:  October 22, 2013

Filed:

_____
Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1 Three Rivers Bank (Bank) and H.E. Simpson Lumber (Simpson) both had business and financial relationships with North End Timber Production, L.L.C. (NET or the mill), a now-defunct sawmill in Olney, Montana, formerly owned and operated by John and Lee Alt. Approximately five years into its operation, NET experienced serious financial difficulties and defaulted on approximately $1,400,000 in loan obligations to the Bank and at the same time owed Simpson approximately $893,500. Subsequently, proceedings were initiated in both Bankruptcy Court and the Eleventh Judicial District Court. While these cases were pending, a fire destroyed the mill. The Bank recovered approximately $980,000 from the mill's insurance proceeds. Following a jury trial conducted in District Court, the jury, hearing the case between the Bank and Simpson, concluded that neither the Bank nor Simpson was entitled to recover damages from the other. Simpson appeals. We affirm.

## ISSUES

¶2 The dispositive issue on appeal is whether the District Court abused its discretion in refusing to admit into evidence a particular letter written by Bank president John King.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Father and son Lee and John Alt started North End Timber in Olney, Montana, in June 2001. NET established its company bank account with Three Rivers Bank and obtained its first loan from the Bank during its first month of operation. In accordance with standard practices, the Bank secured repayment for this loan (and the 14 subsequent loans it would extend during the life of the company) through liens on collateral. The

2

Bank also required NET to obtain an insurance policy naming the Bank as a "loss payee," required the Alts to sign personal guarantees for the loan amounts, and had other NET customers, including Simpson, execute assignment agreements under which these customers when making funds payable to NET, would make them payable to *both* NET and the Bank. The Bank continued to extend loans to NET until April 2006 when NET defaulted, owing the Bank approximately $1,400,000.

¶4 During 2002, NET and Simpson entered into an arrangement under which Simpson would provide NET with operating cash and in return would receive wood to sell in Simpson's lumber facilities. This arrangement remained in place from December 2002 until January 26, 2006, when the relationship between NET and Simpson terminated. During that time more than $6,000,000 in lumber and cash was exchanged between NET and Simpson. As noted above, Simpson executed assignment agreements with the Bank in March 2003 and again in April 2004, in which it agreed to make any advanced funds available to NET payable to both NET and the Bank. For a short period of time, Simpson did not strictly adhere to the terms of the 2003 agreement and advanced funds to NET without the Bank's knowledge. However, Simpson later complied with the assignment agreements. At the time NET terminated its relationship with Simpson, NET owed Simpson approximately $893,500.

¶5 In April 2006, the Bank served notices of default on NET and the Alts and declared all of NET's notes immediately due and payable. The Bank initiated a foreclosure action against NET and filed its initial complaint in District Court on April 26, 2006. It filed an amended complaint on June 13, 2006. Also on June 13, 2006, NET

3

filed for Chapter 11 reorganization in Bankruptcy Court. As a secured creditor, the Bank immediately filed two claims in Bankruptcy Court in the amounts of $1,324,840 and $46,759.73. The foreclosure action in District Court was put on hold by a bankruptcy stay.

¶6 In August 2006, a fire completely destroyed the mill, and as a result, NET's Chapter 11 proceeding was converted to a Chapter 7 liquidation proceeding. As a senior secured creditor, the Bank received $980,000 from insurance proceeds and from minor sales of scrap collateral.

¶7 The Bank's foreclosure action in District Court was revived in February 2008, after which Simpson filed an answer to the Bank's complaint. In March 2008, Simpson filed a counterclaim against the Bank asserting that the Bank interfered with its contractual and business relations with NET, committed constructive fraud, and was equitably estopped from asserting its claims against Simpson. Simpson sought to recover from the Bank up to $850,000 it had loaned to NET but was unable to recover due to the bankruptcy and subsequent fire. In response to Simpson's counterclaim, the Bank filed a second amended complaint alleging, among other things, that Simpson breached two assignment agreements it had executed at the Bank's behest.

¶8 Simpson also filed a cross-claim against the Alts, as guarantors. When the Alts failed to answer or otherwise respond to Simpson's cross-claim, Simpson requested a default judgment. The District Court entered the requested judgments on June 11, 2009, and declared John and Lee Alt each individually and jointly liable to Simpson for $893,525.06. Simpson attempted to execute on these judgments without success.

4

¶9　By 2010, many issues were resolved through motions for summary judgment and several parties were dismissed from the litigation. This left the Bank, the Alts and Simpson as parties, and only three issues for the jury to decide: Simpson's claim for equitable estoppel, the Bank's claims against Simpson pertaining to the assignment agreements, and whether the Bank had mitigated its damages under the assignment agreements.

¶10　Simpson's estoppel claim was based upon Simpson's allegation that King had repeatedly assured Simpson's CEO, Dick Hammett, that the Bank would continue lending the mill funds for its long-term operation if Simpson would continue to advance funds for its short-term operation. There are no records of these assurances and King strongly denied making them. In an effort to establish that King was not a credible witness and his denial should not be believed, Simpson sought to introduce into evidence a March 2004 letter that King sent to the Board of Directors of Northwestern Business Center (or Center or the business center) encouraging the Center to provide capital in the form of loans to NET. It appears that Simpson discovered the existence of this letter sometime during the course of the litigation. In the letter, King advised the Board that NET was a viable business operation at the time and that despite its debt, including $98,000 owed to Simpson, the Center should not reject the investment. Simpson claimed that the letter contained misinformation about the financial well-being of NET, understated NET's debts, and overstated management's ability to continue operating the mill as a viable entity. In other words, Simpson claimed King lied to the Center in an effort to get the business center to advance requested funds.

¶11　On September 27, 2010, the Bank filed motions in limine seeking, among other things, to exclude the March 2004 King letter from evidence. The parties agreed to allow a Special Master to resolve the motions in limine, and on December 1, 2010, the Special Master concluded that King's letter to the Center should be excluded unless Simpson could show it was aware of the letter at the time it was written and relied upon it. Otherwise, the Special Master concluded, the letter was irrelevant and related to a collateral matter; therefore, it should be excluded from evidence.

¶12　The court conducted a jury trial from September 26 - 30, 2011. The jury rendered a verdict in which the Bank prevailed on its claim against Simpson under the 2003 assignment. The jury, however, determined the Bank failed to mitigate its damages and therefore awarded it no damages for this claim. The jury also found against the Bank on its claim under the 2004 assignment and it found against Simpson on its estoppel claim. It awarded no damages to either party.

¶13　Simpson appeals.

## STANDARD OF REVIEW

¶14　We review a district court's decision on the admissibility of evidence for an abuse of discretion. A district court has broad discretion in determining whether evidence is relevant and admissible. It abuses its discretion when it acts arbitrarily without employment of conscientious judgment or so exceeds the bounds of reason as to work a substantial injustice. *Wheaton v. Bradford*, 2013 MT 121, ¶ 13, 370 Mont. 93, 300 P.3d 1162 (internal citations omitted).

# DISCUSSION

¶15    *Did the District Court abuse its discretion when it refused to admit into evidence a particular letter written by Bank president John King?*

¶16    Simpson claims that at various times beginning in 2003, Bank President King made promises to Simpson that if Simpson would continue to provide short-term funding to the mill, the Bank would continue providing long-term funding and would use Simpson's short-term funding to keep the mill operating.  Simpson claims the Bank broke this promise and consequently the Bank should be held liable for the losses Simpson experienced when the mill closed.  No one else was present when King purportedly made these promises to Simpson's president, Dick Hammett.  Hammett testified that Simpson relied upon King's promises to its detriment.  King denies he ever made such promises to Hammett and contends he was without the authority to do so.

¶17    Without any proof of King's promises to Hammett, Simpson attempted to discredit King's veracity by seeking to have the letter King wrote to the business center in 2004 admitted into evidence.  Simpson claims this letter shows that King made untruthful statements to the Center about the financial health of the mill; therefore, the jury could have concluded that King also made untruthful assurances to Simpson.  Simpson claims the letter is relevant because it undermines the presumption "that a witness speaks the truth" by establishing that the witness made prior inconsistent statements.  It asserts that the letter bears directly on King's credibility.  Lastly, Simpson maintains the Bank failed to establish that it was unfairly prejudiced by the letter's admission into evidence.  For these reasons, Simpson argues the District Court abused its discretion when it refused to

7

admit King's letter into evidence. It maintains that had the letter been admitted into evidence, the outcome of its counter-claim for equitable estoppel would have been different.

¶18 As noted above, on September 29, 2010, the parties stipulated to the appointment of a Special Master to resolve various issues including motions in limine filed by the parties. On December 1, 2010, the Special Master issued his ruling and concluded among other things that the Bank president's letter to Northwest Business Center (1) did not establish a "pattern of conduct" that would support Simpson's estoppel claim, (2) was irrelevant, and (3) was related to a collateral matter. During the trial, Simpson nonetheless attempted to question the Bank president about his written representations to Northwest Business Center pertaining to the financial health of NET. However, the District Court precluded this line of questioning.

¶19 Simpson relies on § 26-1-302, MCA, which states that "[a] witness is presumed to speak the truth." The statute provides that this presumption may be controverted in a number of ways, including evidence of "inconsistent statements" by the witness. Simpson claims King's letter to the Center is an "inconsistent statement." It also opines that under M. R. Evid. 401 and 403 (Rules 401 and 403), "evidence bearing upon the credibility of a witness" is relevant and "can only be excluded if its probative value is 'substantially outweighed' by the danger of unfair prejudice . . . under [Rule 403]." Simpson maintains that the content of King's letter establishes his lack of credibility and allows Simpson to satisfy the six elements for its equitable estoppel claim as set forth below.

8

¶20 As we have frequently explained:

> Estoppel is a principle of equity. Equity will grant relief sought when in view of all the circumstances to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition. Estoppel is not favored and will only be sustained upon clear and convincing evidence.

*Dagel v. Great Falls*, 250 Mont. 224, 235, 819 P.2d 186, 193 (1991) (*citing Kenneth D. Collins Agency v. Hagerott*, 211 Mont. 303, 310, 684 P.2d 487, 490 (1984) (internal ellipses omitted)). Simpson claims that it is inequitable that it should suffer financial losses based upon its relationship with NET when the Bank knew about NET's difficulties and failed to tell Simpson about them, misleading it with false assurances. Simpson argues that the evidence of a lie to the business center constitutes support for its contention that King lied to Simpson too.

¶21 We first address Simpson's argument that the letter would support its equitable estoppel claim. In *Dagel*, we set forth the six elements that define an equitable estoppel claim:

1. the existence of conduct, acts, language, or silence amounting to a representation or a concealment of a material fact;

2. these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him;

3. the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him;

4. the conduct must be done with the intention, or at least the expectation, that it will be acted upon by the other party, or under circumstances both natural and probable that it will be so acted upon;

9

5. the conduct must be relied upon by the other party and, thus relying, he must be led to act upon it; and

6. he must in fact act upon it in such a manner as to change his position for the worse.

*Dagel*, 250 Mont. at 234-35, 819 P.2d at 192-93. *See also Elk Park Ranch v. Park Co.*, 282 Mont. 154, 165, 935 P.2d 1131, 1137-38 (1997). We expressly noted in *Elk Park* that if any one of these elements was not present, the theory of equitable estoppel cannot be invoked. *Elk Park*, 282 Mont. at 166, 935 P.2d at 1138.

¶22 We conclude that the King letter could not assist Simpson in its efforts to satisfy the elements of an equitable estoppel claim. As the foregoing test requires, the party to be estopped must make a claim or representation to the other party with the intention at the time of his conduct that the representation will be acted upon by that other party. *Dagel*, 250 Mont. at 234-35, 819 P.2d at 192-93. Further, the other party must rely upon the representation to his detriment. Here, it is undisputed that the King letter and representations were made to Northwest Business Center in 2004, and not to Simpson. It is also undisputed that Simpson did not know of the letter in 2004, nor did it ever rebut the Special Master's determination that the letter should be excluded unless Simpson could show it was aware of the letter at the time it was written and relied upon it. Simpson is therefore unable to demonstrate that it relied upon the representations set forth in King's letter to its detriment. This being so, the letter in question could not lay the groundwork for a judgment in Simpson's favor on its equitable estoppel claim.

¶23 In light of the foregoing, the only remaining basis for the admission of the letter was the contention that its contents could establish that King could be untruthful, and

10

therefore provide grounds for impeaching him. The Special Master determined that the letter could not be used for purposes of impeachment because it related to a "collateral matter." Given that the letter was written in 2004 to a company that was not even a party to this litigation, we conclude that the District Court did not err in adopting the Special Master's conclusions in this regard. We reiterate that it is within the discretion of the District Court to exclude otherwise potentially relevant evidence if its probative value is substantially outweighed by the danger of confusion of the issues or a waste of time. Rule 403. The letter did relate to a collateral matter, and the District Court therefore did not abuse its discretion in excluding it from evidence.

¶24 Finally, we note that the Bank filed a cross-appeal, arguing that the District Court erred in submitting Simpson's equitable estoppel claim to the jury. Because we resolve this matter in favor of the Bank on direct appeal, we do not reach the cross-appeal.

## CONCLUSION

¶25 For the foregoing reasons, we affirm the District Court's ruling excluding King's letter to Northwest Business Center from the evidence presented to the jury.

/S/ PATRICIA COTTER

We concur:

/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS
/S/ BETH BAKER
/S/ JIM RICE